**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

LEE S. SANDERS,

        Plaintiff,

    vs.                       **Case No. 07-4085-RDR**

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

        Defendant.

---

**MEMORANDUM AND ORDER**

This is an order to review a final decision by the Commissioner of Social Security regarding plaintiff's entitlement to supplemental security income (SSI) benefits under the Social Security Act. The parties have briefed the relevant issues and the court is now prepared to rule.

I.

Plaintiff filed his application for SSI benefits on May 30, 2000. The application was denied initially and on reconsideration. A hearing was ultimately held by an administrative law judge (ALJ) on plaintiff's application. On August 16, 2002, the ALJ determined that plaintiff was not disabled. On May 25, 2004, however, the Appeals Council of the Social Security Administration remanded plaintiff's case for a supplemental hearing. After a supplemental hearing, the ALJ determined again on July 27, 2005 that plaintiff was not disabled. On May 17, 2007, the Appeals Council declined further review of the ALJ's decision. Thus, the decision of the

ALJ on July 27, 2005 remains as the final decision of the Commissioner.

II.

The ALJ's decision is binding on the court if supported by substantial evidence. Dixon v. Heckler, 811 F.2d 506, 508 (10th Cir. 1987). The court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. See Castellano v. Secretary of HHS, 26 F.3d 1027, 1028 (10th Cir. 1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Evidence is not substantial "if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion." Knipe v. Heckler, 755 F.2d 141, 145 (10th Cir. 1985) (citation omitted).

Plaintiff bears the burden of proving disability under the Social Security Act. See Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989). The Social Security Act defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. See 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential

evaluation:   (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing her past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. See 20 C.F.R. §§ 404.1520, 416.920.  If a claimant satisfies steps one, two and three, he will automatically be found disabled; if a claimant satisfies steps one and two, but not three, he must satisfy step four.  If step four is satisfied, the burden shifts to the Commissioner to establish that the claimant is capable of performing work in the national economy. See Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988).

III.

Plaintiff was born on March 2, 1968.  He completed the 10th grade.  He has past experience as a dishwasher, production worker, janitor, cook and construction worker.  Plaintiff has alleged he is disabled due to a sleeping disorder, learning disorder, depression, obesity and chronic pain in his back, shoulder and leg.  Because plaintiff's application is for SSI benefits only, the relevant period begins the day plaintiff applied for benefits, May 30, 2000.

Plaintiff was in the Douglas County Jail for various periods from 1998 to 2002.  During that incarceration he made numerous complaints of pain in his back, shoulders and knees.  He also noted

breathing and sleeping problems.  He was seen by various doctors during those years as a result of these complaints.  Those examinations are detailed below.  He has also been seen over the years for evaluations based upon his disability claims.  Those sessions are also detailed below.

In June of 1997, plaintiff was seen by Ross A. Sciara, D.O. Plaintiff told Dr. Sciara that he was suffering from headaches, a sleep disorder, and pain in his back, knees and left ankle.  Dr. Sciara prescribed medication for pain and suggested a sleep study. Plaintiff was then seen by L. Elaine Kennedy, M.D., for the sleep study on July 20, 1998.  Plaintiff recounted to Dr. Kennedy that he had trouble sleeping at night and that he takes naps during the day, as often as six times a day.  He also noted that when he is drinking with his friends, he has no trouble sleeping at night. During the sleep study, plaintiff had 283 arousals and 56 awakenings.  Treatments of C-PAP and BiPAP were initiated during the study but plaintiff could not tolerate them.  Dr. Kennedy reached the following conclusion:  "severe obstructive sleep apnea with severe hypoxemia in a patient intolerant of CPAP and BiPAP." Dr. Kennedy recommended the following:  (1) avoid alcohol and sedatives; (2) have thyroid function measured; (3) attempt to achieve a normal body weight; (4) begin using supplemental oxygen; and (5) see ENT regarding procedures such as uvulopalato-pharyngoplasty to improve mild sleep apnea and hypopnea.  On

December 10, 1998, an x-ray of plaintiff's chest showed it was normal.

Plaintiff was examined at the Shawnee County Health Agency on several occasions in January 1999. He complained primarily of back pain, but also noted depression. He stated that he had difficulty finding jobs due to his sleep apnea. He was observed sleeping and snoring loudly while waiting there. He was given medication for the pain. An x-ray of his lumbar spine on February 10, 1999 was negative.

On January 15, 1999, plaintiff was examined by Robert W. Hughes, M.D. Dr. Hughes concluded that his conditions of asthma, sleep apnea, hypertension and pain in his joints, back, knee and left ankle did not prevent the performance of gainful employment.

A mental status examination was performed on January 25, 1999. The examiner found that plaintiff "did not appear as depressed as he described." She did note that plaintiff appeared tired and "a few times fell asleep for a few seconds." She found that his depression did not meet the criteria for "Major Depression," but that it did for "Dysthymic Disorder." She noted that plaintiff had low motivation, low self-esteem and poor concentration.

On February 15, 1999, plaintiff was examined by Carroll D. Ohlde, Ph.D., for a psychological assessment. Dr. Ohlde reached the following conclusions on plaintiff's ability to perform work-related skills and handle finances:

He was attentive enough during the interview to respond to and understand questions and instructions directed to him and would likely be able to understand and carry out simple instructions. His attention/concentration and short-term memory abilities were adequate. His capacity to sustain concentration over a workday and to relate adequately to co-workers and supervisors in typical work environments is probably also adequate. Based on his current overall psychological functioning, he could probably meet acceptable performance standards if his health permits him to do so. Given his adequate comprehension, insight, math skills, and attention and concentration abilities, he could manage his own funds.

Plaintiff was seen by Ted W. Daughety, M.D., on October 15, 1999. He had previously seen plaintiff in 1996 and at that time had recommended the sleep study that was ultimately conducted in July 1998. Dr. Daughety believes that plaintiff may require a nasal CPAP for his sleep apnea. He recognized that Medicaid did not provide for such treatment, but he believed that several alternatives might exist to provide the necessary treatment.

Plaintiff was seen by C. C. Penn, M.D., on April 4, 2000. Plaintiff complained of pain in his left shoulder and neck. Dr. Penn found some tenderness in the shoulder, but normal range of motion. He prescribed pain medication.

In a work history report provided to the SSA on June 28, 2000, plaintiff made the following statement:

My major impairment to employment is my sleep apnea. I fall asleep on my feet and am fatigued frequently. This condition prevents me from being gainfully employed.

Plaintiff went to the Lawrence Memorial Emergency Room on March 16, 2000 complaining of pain in his shoulder and left arm.

6

He was seen by Sabrina Prewett, D.O.   Dr. Prewett provided medication for the pain and scheduled a follow-up appointment.  She noted that plaintiff suffered from sleep apnea and he demonstrated that when he was left unstimulated.  X-rays were normal.  An EKG showed no ischemic changes.  Plaintiff was discharged in a stable and fair condition.

On June 14, 2000, plaintiff was seen by Steven C. Bruner, M.D. Dr. Bruner conducted a fairly extensive examination.  He found normal range of motion in plaintiff's neck and extremities.  A brief neurologic exam was within normal limits.  He noted that plaintiff was morbidly obese.  He found that none of his conditions were disabling.  He did note, however, that he needed additional information on his sleep apnea syndrome.  He stated:  "He probably does need a new mask and needs to use it on a regular basis."

A mental status examination was conducted by Patrick J. Datore, Ph.D., on August 8, 2000.  Dr. Datore did not find any diagnosable psychiatric disorder.  He found plaintiff capable of understanding and following simple instructions.  He also found that plaintiff's capacities for attention, concentration and memory were grossly intact.  He did note that plaintiff was somewhat immature and dependent characterologically.

Robert E. Shulman, Ph.D., conducted a psychological consultation on November 17, 2000 and concluded that plaintiff's allegation of depression was not credible.  His review of the

mental status exam showed no psychiatric disorders.

On April 9, 2001, plaintiff was examined by K. Roberts, A.R.N.P.-C, for a physical. Roberts found musculoskeletal limitations with marked difficulty standing or walking, which he expected to last for at least 12 months. He also noted morbid obesity. He suspected sleep apnea, but could not confirm it.

On June 4, 2001, x-rays of plaintiff's thoracic spine showed normal alignment. The intervertebral spaces were well maintained, and there were no fractures or other significant radiographic abnormalities.

Plaintiff was examined by R.F. Sosinski, M.D., on August 31, 2001. Plaintiff complained of pain in his back, neck, right shoulder and left knee. Dr. Sosinski prescribed medication for the pain and scheduled an MRI scan. An x-ray of the left knee showed a normal left knee with no fracture or dislocation.

Plaintiff saw Dr. Sosinski again on May 2, 2002 for a vocational rehabilitation physical. Plaintiff reported a pinched nerve in his neck, numbness down his left arm, trouble sleeping with daytime somnolence, multi-joint pain and morbid obesity. Dr. Sosinski assessed morbid obesity, obstructive sleep apnea with marked tonsillar enlargement, neck pain with radicular symptoms, and osteoarthritis with possible anterior cruciate tear of the left knee. He prescribed medication for the arthritis and neck problems. He indicated that plaintiff "needs to see ENT regarding

possible tonsillectomy to treat his sleep apnea, since he doesn't tolerate the C-PAP."

Plaintiff was seen by Ira H. Fishman, D.O., on May 3, 2002 for a physiatric examination. Plaintiff complained that he suffered from pain in neck, back and knees. He told Dr. Fishman that he was unable to tolerate prolonged standing, walking, sitting, as well as kneeling and squatting. Dr. Fishman's physical examination failed to yield any significant objective findings to correlate with plaintiff's subjective complaints of pain. Dr. Fishman found full range of motion of all joints without instability. He did note that plaintiff was morbidly obese. Dr. Fishman found that plaintiff could occasionally lift 50 pounds and could frequently lift 20 pounds. He also found that plaintiff (1) could stand and/or walk about six hours in an eight-hour workday; and (2) could sit about six hours in an eight-hour workday. He found few limitations in plaintiff's ability to work.

Plaintiff saw Dr. Sosinski on September 3, 2002 with complaints of back pain. He noted that plaintiff had marked tenderness in the lower lumbar area and some spasm over to the right. He again noted that plaintiff had huge tonsils and indicated that he needed to contact an ENT about the possibility of sleep apnea. He prescribed medication for the back pain.

Dr. Sosinski saw plaintiff again on November 12, 2003. At that time, he assessed chronic low back pain; acute and probably

chronic sinusitis; sleep apnea syndrome, probably severe; and headaches. He stated: "I can't really see how he can work at this time. He really needs to have his sleep apnea worked up and treated."

Another mental status examination was conducted on July 30, 2004. Robert W. Barnett, Ph.D., conducted the exam and found that plaintiff had no intellectual limitations that would interfere with employment. He noted his attention and concentration were unimpaired. He further noted that plaintiff was capable of both simple and complex work tasks. He did, however, note an ongoing substance abuse problem.

On August 9, 2004, plaintiff was seen by Carl A. Inzerillo, D.O., for a disability determination examination. Plaintiff complained of low back pain and a sleeping problem. After examination, Dr. Inzerillo summarized plaintiff's problems as follows: "[Plaintiff] most likely has sleep apnea, suffers from depression, is morbidly obese that probably limits him to his type of ability to do work."

On January 4, 2005, a pulmonary function test was conducted on plaintiff. At the time of this examination, plaintiff was 5 feet 10 inches tall and weighed 314 pounds. The technician indicated that plaintiff gave excellent effort during the tests but it was difficult to get consistent results due to an upper airway obstruction. The technician did note that plaintiff kept falling

10

asleep during breaks between testing.

Plaintiff was seen again by Dr. Inzerillo on February 21, 2005. Plaintiff told Dr. Inzerillo that he had stopped drinking alcohol. Plaintiff was complaining primarily of pain in his knees and ankles. Dr. Inzerillo found that plaintiff's knees and ankles appeared normal. He noted that plaintiff was undergoing testing at the present time for sleep apnea. He indicated his findings concerning plaintiff's functional capacity were in agreement with those of Dr. Fishman.

At the hearing before the ALJ, plaintiff testified that he had previously worked at several factory and temporary jobs. He indicated that he had lost several of the jobs because he fell asleep while working. He further stated that he fell asleep on the way to the hearing and once while waiting for the hearing to start. He does not sleep peacefully and he snores quite loudly. Plaintiff indicated that he believed his sleep apnea and bad back pain would prevent him from working. He does not drive because he falls asleep. He suggested his physical conditions have gotten worse in the last two years. He testified that he tires easily and has to rest after a four-block walk. He watches television and rents movies and watches them. He indicated that he falls asleep while watching the movies. Plaintiff said that he falls asleep because he is "bored or comfortable." He testified that he was not taking any medication because he could not afford it. He said he had not

had a sleep study in "years."   He stated that he quit drinking alcohol.

The record also contains testimony from the plaintiff on two other occasions.   At those hearings, he testified about quitting a prior night job at Wal-Mart because he was afraid he would fall asleep on the job.   He described his daily activities and they revolved around his sleeping.   He did say, however, that he was able to stay awake when he needed to do things such as babysit for his mother.   He did state that his sleeping habits have led him to lose employment.   He said he had tried to use a breathing machine at night to help him sleep but had trouble with the hoses.   He indicated that he was presently attempting to obtain a mask to see if that helps.   He said that he had trouble sleeping at night and was unable to go to sleep until four a.m.   But, he indicated that he would sleep at night if he was engaged in some activity because he got tired.   He also testified about the pain he suffers in his knee, back, ankles and joints.   He indicated he was taking medication for it.   He said he can only walk two blocks before he has to sit down.   He indicates that he can only sit for about an hour.   He testified that he could do laundry, wash dishes and cook around the house.   He also stated that doctors had told him that if he lost weight his conditions would be helped, particularly the pain he suffers.

Richard Sherman, a vocational expert, testified before the ALJ

in 2002.  At that time, the ALJ asked the vocational expert whether a person with plaintiff's age, education and limited light residual functional capacity could perform any work.  The vocational expert testified that such a person would be able to perform several jobs, including the sedentary jobs of surveillance systems monitor and information clerk.  He did indicate, however, that if plaintiff fell asleep at unpredictable intervals, then he would not be employable.

Selbert G. Chernoff, M.D., also testified before the ALJ.  He noted that plaintiff was morbidly obese and had obstructive sleep apnea.  He indicated it was not clear that his obstructive sleep apnea was producing a significant impairment.  He further noted that obstructive sleep apnea was not a difficult illness to treat. He also noted that plaintiff complained of pain in various areas, but there were no medically determinative impairments that appeared to cause the pain.  He believed that plaintiff could do menial work, lift 50 pounds occasionally and 20 to 25 pounds frequently. He saw no other limitations except perhaps avoiding hazards because of plaintiff's complaints of drowsiness.  Dr. Chernoff noted that plaintiff's pulmonary function tests were reasonably normal.

The ALJ found that plaintiff suffered from morbid obesity and obstructive sleep apnea, which were severe impairments under the meaning of the Social Security Act.  The ALJ, however, found that plaintiff did not meet or equal any impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, Listing of Impairments.  He
determined that plaintiff's allegations regarding his limitations
were not totally credible.  He found that plaintiff retained the
residual functional capacity to perform a range of sedentary work.
The ALJ determined that plaintiff did not have previous jobs of
sufficient duration to qualify as past relevant work, but with the
assistance of testimony from a vocational expert at the hearing, he
decided that plaintiff retained the ability to perform other work
found in significant numbers in the national economy, such as a
surveillance monitor and information clerk.  The ALJ, therefore,
found that plaintiff was not disabled at step five of the
sequential evaluation process.

IV.

    Plaintiff contends that the ALJ erred in three ways:  (1) in
assigning weight to the various physicians; (2) by misapplying the
appropriate legal standards when evaluating plaintiff's subjective
complaints; and (3) in assessing plaintiff's residual functional
capacity.

A.  Medical Evidence

    Plaintiff initially argues that the ALJ failed to properly
consider the medical evidence in this case.  He contends that the
ALJ gave too much weight to the opinions of the physicians who
merely reviewed plaintiff's medical records and too little weight
to his treating physician.

14

It is settled that the ALJ is required to "evaluate every medical opinion" he receives. <u>Baker v. Bowen</u>, 886 F.2d 289, 291 (10th Cir. 1989) (requiring ALJ to "consider all relevant medical evidence of record in reaching a conclusion as to disability"). Most importantly, an ALJ must fully evaluate evidence from a claimant's treating doctors. <u>Watkins v. Barnhart</u>, 350 F.3d 1297, 1300 (10th Cir. 2003). A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it. <u>Frey v. Bowen</u>, 816 F.2d 508, 513 (10th Cir. 1987). When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physicians' reports "to see if [they] 'outweigh[ ]' the treating physician's report, not the other way around." <u>Reyes v. Bowen</u>, 845 F.2d 242, 245 (10th Cir. 1988). The ALJ must give specific, legitimate reasons for disregarding the treating physician's opinion that a claimant is disabled. <u>Frey</u>, 816 F.2d at 513.

The court has carefully reviewed the medical evidence in this case. The court finds that the ALJ's analysis and assessment, while not perfect, was adequate. The ALJ considered the treating physician's opinion that plaintiff could not work. He gave the opinion of the treating physician "little weight" because (1) neither clinical signs nor laboratory findings supported it; (2) his level of treatment did not support it; and (3) the remaining record did not support it. In reaching the aforementioned

conclusion, the ALJ carefully considered the reports of the other doctors who examined plaintiff or who issued reports after review of his medical records.  He found that the laboratory findings and clinical signs failed to support plaintiff's complaints of pain in his back, ankles and knees.  He noted that most of the exams found that plaintiff had a full range of motion and x-rays were normal. He also found no objective signs of a disabling mental disorder. There was inadequate evidence of depression or emotionally caused clinical signs.  With regard to sleep apnea, the ALJ noted that various treatments had been suggested and that plaintiff had failed to carry out those recommendations.  He further noted that plaintiff had generally failed to seek any consistent treatment for his sleep apnea.  Insubstantial or infrequent attempts to obtain relief from a painful condition are inconsistent with allegations of disabling pain.  See Branum v. Barnhart, 385 F.3d 1268, 1274 (10th Cir. 2004).  While plaintiff claims that his poverty prevents him from seeking further medical care, he has provided no evidence that he "sought to obtain any low-cost medical treatment from h[is] doctor or from clinics and hospitals" or that he has "been denied medical care because of h[is] financial condition."  Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992); cf. Threet v. Barnhart, 353 F.3d 1185, 1191 n. 7 (10th Cir. 2003) (indicating "that inability to pay may provide a justification for [the] claimant's failure to seek treatment" when there is evidence that

16

the claimant sought and was refused treatment).  The ALJ also found that plaintiff had engaged in activities such as drinking and smoking crack cocaine that could have a negative impact on his sleep apnea.  Finally, he determined that plaintiff's level of activities was inconsistent with his complaints of pain, depression and sleep apnea.

The ALJ ultimately must weigh and resolve evidentiary conflicts, and the court cannot reweigh evidence.  <u>Rutledge v. Apfel</u>, 230 F.3d 1172, 1174 (10th Cir. 2000); <u>see also</u> <u>White v. Barnhart</u>, 287 F.3d 903, 909 (10th Cir. 2001) (court will not second-guess ALJ decision).  The court finds that the ALJ properly considered all of the medical evidence and properly evaluated the various conflicting medical records, including those of the plaintiff's treating physician.  Accordingly, the court finds no merit to the arguments of the plaintiff.

B.  Credibility

Plaintiff next contends that the ALJ did not properly consider his subjective complaints.  He has suggested that the ALJ improperly (1) relied upon a version of the discredited "sit and squirm" test; (2) failed to discuss evidence in the record that he does fall asleep when sitting; and (3) considered his failure to lose weight.

In reviewing ALJ credibility determinations, the court should "defer to the ALJ as trier of fact, the individual optimally

17

positioned to observe and assess witness credibility." Casias v. Secretary of HHS, 933 F.2d 799, 801 (10th Cir. 1991). "Credibility is the province of the ALJ." Hamilton v. Secretary of HHS, 961 F.2d 1495, 1499 (10th Cir. 1992). At the same time, the ALJ must explain why specific evidence relevant to each factor supports a conclusion that a claimant's subjective complaints are not credible. See Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (quoting Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). So long as he sets forth the specific evidence he relies on in evaluating the claimant's credibility, the ALJ is not required to conduct a formalistic factor-by-factor recitation of the evidence. White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2001); see Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).

The court has thoroughly reviewed the ALJ's credibility determination. Again, the ALJ's analysis and assessment, while not perfect, is sufficient. A review of his decision reveals that he properly considered the entirety of the record in reaching his conclusions. The court does not find that he simply rejected any evidence. In finding plaintiff not credible concerning his complaints of pain, mental problems and sleep apnea, the ALJ pointed to inconsistent or unsupported statements made by plaintiff

concerning the following matters:  (1) his loss of past employment;
(2) his failure to consistently seek or obtain treatment; (3) his
prior schooling and why he left school; (4) his prior use of
alcohol and cocaine; (5) his prior automobile accidents; and (6)
his prior incarcerations.  The court believes that the ALJ's
decision to find the plaintiff only partially credible is supported
by substantial evidence.  Although the ALJ could have discussed the
evidence in greater detail, the record need only demonstrate that
he considered all of the evidence.  The court finds that he did so.

C.  Residual Functional Capacity

     Finally, plaintiff contends that the ALJ erred in assessing
plaintiff's residual functional capacity.  He has suggested that
the ALJ's residual functional capacity did not sufficiently account
for sleep apnea.

     The court is persuaded that the hypothetical question asked by
the ALJ of the vocational expert was proper in light of the ALJ's
assessment of the impairments for which he found support in the
record.  The ALJ subsequently properly clarified the question by
including a sit/stand option and a limitation of lifting no more
than three to four pounds.  The court believes that the ALJ
properly assessed plaintiff's residual functional capacity.
Accordingly, we also find no merit to this argument.

                              V.

     In sum, the court finds that the decision of the ALJ is

                              19

supported by substantial evidence.   Accordingly, the decision of the ALJ must be affirmed.

   **IT IS SO ORDERED.**

   Dated this 29th day of December, 2008 at Topeka, Kansas.


                              s/Richard D. Rogers
                              United States District Judge